Christopher J. Hunker
Clark L. Xue
Matthew J. Bopp
**LINKLATERS LLP**
1290 Avenue of the Americas
New York, NY 10104
(212) 903-9000

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Country Garden Holdings Company Limited,[1] | Case No. 25-12175 (PB) |
| Debtor in a Foreign Proceeding. | |

## DECLARATION OF FONG CHING LAM
## IN SUPPORT OF THE VERIFIED PETITION UNDER CHAPTER 15 FOR
## RECOGNITION OF A FOREIGN MAIN PROCEEDING AND RELATED RELIEF

I, Fong Ching Lam, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America, as follows:

1.      I am over the age of 18 and, if called upon, could testify to all matters set forth in this Declaration (the "Declaration").  I am a Deputy General Manager of Country Garden Holdings Company Limited ("Country Garden" or the "Debtor," and together with its directly and indirectly owned non-Debtor subsidiaries, the "Country Garden Group") and the duly authorized foreign representative (the "Foreign Representative") of the Debtor.  I am acquainted with the affairs of the Debtor, and I am fully apprised of its financial position.  All facts set forth in this Declaration are based upon (a) my personal knowledge; (b) my review of relevant documents and any and all

---

[1] Country Garden Holdings Company Limited's company registration number is 177345, and the location of its registered office is Conyers Trust Company (Cayman) Limited, Cricket Square, Hutchins Drive, P.O. Box 2681, George Town, Grand Cayman KY1-1111, Cayman Islands.

documents prepared and filed in connection with the Hong Kong Proceeding (as defined below) and the above-captioned chapter 15 case (the "Chapter 15 Case"); (c) information supplied to me by the officers, directors, employees, or professionals retained by the Debtor; or (d) my experience and knowledge of the Debtor's assets and financial condition.

2.      I submit this Declaration in accordance with section 1515 of the United States Code (the "Bankruptcy Code") and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure.

3.      The Debtor is the subject of a proceeding in Hong Kong entitled *In the Matter of Country Garden Holdings Company Limited* (Case Number HCMP 1366 / 2025) (the "Hong Kong Proceeding") currently pending before the High Court of the Hong Kong Special Administrative Region Court of First Instance (the "Hong Kong Court") concerning a scheme of arrangement (the "Scheme") between Country Garden and those persons defined in the Scheme as "Scheme Creditors" (the "Scheme Creditors") pursuant to sections 670, 673 and 674 of the Hong Kong Companies Ordinance (Cap. 622 of the Laws of Hong Kong) (the "Companies Ordinance").  In my capacity as the Foreign Representative, I have detailed knowledge of, and experience with, the Debtor's affairs and its creditors.

4.      On September 23, 2025, Country Garden's Board (the "Board") passed a resolution (the "Board Resolution") authorizing me to take certain actions as necessary to act as Country Garden's sole Foreign Representative in connection with this Chapter 15 Case.  I have been authorized to commence this Chapter 15 Case on behalf of Country Garden on the date hereof by filing a petition seeking recognition of the Hong Kong Proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code.

5.      I submit this Declaration in support of (a) the *Chapter 15 Petition for Recognition of a Foreign Proceeding* (the "Petition"), (b) the *Verified Petition Under Chapter 15 for*

*Recognition of a Foreign Main Proceeding and Related Relief* (the "Verified Petition," and together with the Petition, the "Chapter 15 Petition")[2] and (c) the *Motion for Entry of an Order Scheduling a Hearing on Recognition and Related Relief and Specifying Form and Manner of Service of Notice*, each filed contemporaneously herewith.[3]

6.      Section I of this Declaration describes the Debtor and the Country Garden Group, including specific information about the Debtor's center of main interests in Hong Kong and connections to the United States.   Section II describes the Country Garden Group's capital structure.   Section III describes the circumstances leading to the Restructuring and the Restructuring Support Agreements.   Section IV provides a summary of the material terms of the Restructuring that is being implemented through the Scheme, including the Scheme Consideration Entitlement (as defined below) being distributed to Scheme Creditors and the Releases (as defined below) set forth in the Scheme.   Section V describes the Hong Kong Proceeding.   Section VI sets forth the need for chapter 15 relief and the factual basis in support of that relief.

## I.   The Debtor and the Country Garden Group

7.      Country Garden was incorporated in the Cayman Islands as a limited liability company on November 10, 2006.   Country Garden maintains a principal place of business and headquarters in Hong Kong located at Suite 1702, Dina House, Ruttonjee Centre, 11 Duddell Street, Central, Hong Kong, and is also registered as a non-Hong Kong company in Hong Kong under Part 16 of the Companies Ordinance.   The shares of Country Garden were listed on the main board of The Stock Exchange of Hong Kong Limited (the "HKEX") with stock code 02007 on

---

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Chapter 15 Petition.

[3]   Reference is made to the *Declaration of Richard Woodworth as Hong Kong Counsel in Support of Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief* (the "Counsel Declaration").

April 20, 2007.  Country Garden is the ultimate holding company of the Country Garden Group, which comprises Country Garden and its directly and indirectly owned subsidiaries, which are incorporated in various jurisdictions including the Cayman Islands, the Peoples' Republic of China ("PRC"), Hong Kong, New Zealand, Australia, the United States, Indonesia, Thailand, Malaysia, and the British Virgin Islands.

8.      The business of the Country Garden Group is property development, construction, interior decoration, property investment, and the development, operation, and management of hotels, primarily in the PRC.  For the year ending on December 31, 2024, the Country Garden Group's total revenue was approximately RMB 252.756 billion (or approximately USD 35.105 billion).  Revenue from property sales, and other income such as technology-enabled construction and hotel operations accounted for 97.2% and 2.8%, respectively.

9.      As discussed in more detail below, Country Garden maintains its center of main interests ("COMI") in Hong Kong.

## II.    Existing Capital Structure and Existing Debt

### A.      Assets and Liabilities of the Country Garden Group

10.     As of December 31, 2024, the Country Garden Group's non-current assets amounted to approximately RMB 118.958 billion (or approximately USD 16.522 billion), and the Country Garden Group's current assets amounted to approximately 916.885 billion (or approximately USD 127.345 billion), which primarily consisted of the following:

      a.      approximately RMB 465.996 billion (or approximately USD 64.721 billion) in properties under development;

      b.      approximately RMB 112.271 billion (or approximately USD 15.593 billion) in properties held for sale; and

      c.      approximately RMB 267.648 billion (or approximately USD 37.174 billion) in trade other receivables.

11.    As of December 31, 2024, the Country Garden Group's non-current liabilities amounted to approximately RMB 41.839 billion (or approximately USD 5.811 billion), and its current liabilities amounted to approximately RMB 942.75 billion (or approximately USD 130.938 billion).

**B.    Financing Agreements**

12.    Country Garden has entered into various financing agreements and incurred certain financial indebtedness. The first broad category of Country Garden's financial indebtedness comprises of three secured syndicated loans governed by Hong Kong law (the "Existing Syndicated Loans" or the "Existing Class 1 Debt"). Country Garden is the borrower under the Existing Class 1 Debt.

13.    Under the second broad category of financial indebtedness, Country Garden is (i) the guarantor of two series of publicly traded HK dollar-denominated convertible bonds governed by English law (the "Existing Convertible Bonds"); (ii) the issuer of fifteen series of publicly traded U.S. dollar-denominated senior notes governed by New York law (the "Existing US Public Notes"); (iii) the borrower of two unsecured bilateral loans governed by Hong Kong Law (the "Existing HK Bilateral Loans"); and (iv) the guarantor or borrower under thirteen bilateral loans, which have the benefit of credit support provided by PRC-incorporated subsidiaries of the Group governed by PRC law (the "Existing Loans (Onshore Credit Support)" and together with the Existing Convertible Bonds, the Existing US Public Notes, and the Existing HK Bilateral Loans, the "Existing Class 2 Debt," and together with the Existing Class 1 Debt, the "Existing Debt").

14.    Lastly, Country Garden is also a borrower or guarantor under certain other financial indebtedness that is excluded from the Scheme, which includes various offshore project financing, other onshore loans and corporate bonds, and trade and other payables and accruals.

1.     **Overview of the Existing Class 1 Debt**

15.     The Existing Class 1 Debt comprises of obligations incurred by Country Garden with an aggregate outstanding principal amount of approximately USD 3.618 billion as of December 31, 2024 under the following instruments:

    a.   **_Existing Syndicated Loans_**: three secured syndicated loans governed by Hong Kong law, including:

        i.    HKD 8,133,300,000 and USD 453,000,000 dual currency term loan facility agreement dated October 21, 2020, by and between, among others, Country Garden as borrower and Bank of China (Hong Kong) Limited as facility agent and lender;

        ii.   HKD 6,076,000,000 and USD 559,000,000 dual currency term loan facility agreement dated July 22, 2021, by and between, among others, Country Garden as borrower and China Construction Bank Corporation, Hong Kong Branch as facility agent and lender; and

        iii.  HKD 3,583,020,000 and USD 388,660,000 dual currency term loan facility agreement dated July 20, 2023, by and between, among others, Country Garden as borrower and Bank of China (Hong Kong) Limited as facility agent and lender.

2.     **Overview of the Existing Class 2 Debt**

16.     The Existing Class 2 Debt comprises of liabilities incurred by Country Garden with an aggregate outstanding principal amount of approximately USD 11.076 billion as of December 31, 2024 under the following instruments:

    a.   **_Existing Convertible Bonds_**: two series of publicly traded HKD denominated convertible bonds governed by English law:

        i.    HKD 3,900,000,000 4.95% Secured Guaranteed Convertible Bonds due 2026 (ISIN: XS2434313016); and

        ii.   HKD 7,830,000,000 4.50% Secured Guaranteed Convertible Bonds due 2023 (ISIN: XS1914667057).

    b.   **_Existing US Public Notes_**: fifteen series of publicly traded U.S. dollar-denominated senior notes governed by New York law:

        i.    USD 1,000,000,000,000 8.0% Senior Notes due 2024 (ISIN: XS1880442717);

ii.     USD 550,000,000 6.5% Senior Notes due 2024 (ISIN: XS1974522853);

iii.    USD 750,000,000 5.125% Senior Notes due 2025 (ISIN: XS1750118462);

iv.     USD 544,000,000 5.4% Senior Notes due 2025 (ISIN: XS2178949561);

v.      USD 500,000,000 6.15% Senior Notes due 2025 (ISIN: XS2051371222);

vi.     USD 1,000,000,000,000 3.125% Senior Notes due 2025 (ISIN: XS2240971742);

vii.    USD 500,000,000 4.2% Senior Notes due 2026 (ISIN: XS2210960022);

viii.   USD 1,350,000,000 7.25% Senior Notes due 2026 (ISIN: XS1974522937);

ix.     USD 700,000,000 2.7% Senior Notes due 2026 (ISIN: XS2280833133);

x.      USD 350,000,000 5.625% Senior Notes due 2026 (ISIN: XS1512953040);

xi.     USD 550,000,000 5.125% Senior Notes due 2027 (ISIN: XS2100725949);

xii.    USD 450,000,000 5.625% Senior Notes due 2030 (ISIN: XS2100726160);

xiii.   USD 500,000,000 4.8% Senior Notes due 2030 (ISIN: XS2210960378);

xiv.    USD 500,000,000 3.875% Senior Notes due 2030 (ISIN: XS2240971825); and

xv.     USD 700,000,000 3.3% Senior Notes due 2031 (ISIN: XS2280833307);

c.   ***Existing HK Bilateral Loans***: two unsecured bilateral loans governed by Hong Kong Law:

i.      HKD 1,880,000,000 term loan facility agreement dated December 1, 2021, by and between, among others, Country Garden as borrower and Ever Credit Limited as lender; and

ii.    USD 280,000,000 dual currency term loan facility agreement dated December 26, 2022, by and between, among others, Country Garden as borrower and Industrial and Commercial Bank of China (Asia) Limited as facility agent;

d.    ***Existing Loans (Onshore Credit Support)***: thirteen bilateral loans, which have the benefit of credit support provided by PRC-incorporated subsidiaries of the Group:

i.    HKD 950,000,000 term loan facility agreement dated March 31, 2023, by and between, among others, Country Garden as borrower and Tai Fung Bank Limited as lender (the "Tai Fung Loan");

ii.    The CNY 500,000,000 term loan facility agreement (房地产开发贷款借款合同) dated February 15, 2022 entered into between Baoding Lixu Real Estate Development Co., Ltd. (保定立旭房地产开发有限公司) as borrower and Postal Savings Bank of China Co., Ltd., Baoding Branch (中国邮政储蓄银行股份有限公司保定市分行) as lender;

iii.    CNY 500,000,000 term loan facility agreement (房地产开发贷款借款合同) dated July 22, 2021 entered into between Cangzhou Bihua Real Estate Development Co., Ltd.(沧州碧华房地产开发有限公司) as borrower and Postal Savings Bank of China Co., Ltd ., Cangzhou Branch (中国邮政储蓄银行股份有限公司沧州市分行) as lender;

iv.    CNY 170,000,000 term loan facility agreement (房地产开发贷款借款合同) dated April 24, 2023 entered into between Tianjin Haichang Property Development Co., Ltd. (天津海昌房地产开发有限公司) as borrower and Postal Savings Bank of China Co., Ltd., Tianjin Pilot Free Trade Zone Branch (中国邮政储蓄银行股份有限公司天津自由贸易试验区分行) as lender;

v.    CNY 500,000,000 term loan facility agreement (房地产开发贷款借款合同) dated June 22, 2020 entered into between Xiangyang Rongbi Real Estate Development Co., Ltd. (襄阳荣碧房地产开发有限公司) as borrower and Postal Savings Bank of China Co., Ltd., Xiangyang Branch (中国邮政储蓄银行股份有限公司襄阳市分行) as lender;

vi.    CNY 800,000,000 term loan facility agreement (房地产开发贷款借款合同) dated April 28, 2021 entered into between Wuhan Changhuan Property Co., Ltd. (武汉常欢置业有限公司) as

borrower and Postal Savings Bank of China Co., Ltd., Wuhan Branch (中国邮政储蓄银行股份有限公司武汉市分行) as lender;

vii.    CNY 1,000,000,000 term loan facility agreement (房地产开发贷款借款合同) dated November 18, 2022 entered into between Changzhou Borui Real Estate Development Co., Ltd. (常州博瑞房地产开发有限公司) as borrower and Postal Savings Bank of China Co., Ltd., Changzhou Branch (中国邮政储蓄银行股份有限公司常州市分行) as lender;

viii.   CNY 600,000,000 term loan facility agreement (房地产开发贷款借款合同) dated March 21, 2022 entered into between Weifang Zhuojing Health Technology Co., Ltd. (潍坊市卓景健康科技有限公司) as borrower and Postal Savings Bank of China Co., Ltd (中国邮政储蓄银行股份有限公司潍坊市分行., Weifang Branch) as lender;

ix.     CNY 300,000,000 term loan facility agreement (房地产开发贷款借款合同) dated December 28, 2021 entered into between Suqian Xinyang Real Estate Development Co., Ltd. (宿迁市新洋房地产开发有限公司) as borrower and Postal Savings Bank of China Co., Ltd., Suqian Branch (中国邮政储蓄银行股份有限公司宿迁市分行) as lender;

x.      CNY 700,000,000 term loan facility agreement (房地产开发贷款借款合同) dated November 15, 2021 entered into between Huzhou Fulan Real Estate Development Co., Ltd. (湖州富澜房地产开发有限公司) as borrower and Postal Savings Bank of China Co., Ltd., Huzhou Branch (中国邮政储蓄银行股份有限公司湖州市分行) as lender;

xi.     CNY 120,000,000 term loan facility agreement (房地产开发贷款借款合同) dated July 26, 2021 entered into between Yulin Huixiang Real Estate Development Co., Ltd. (玉林市汇享房地产开发有限公司) as borrower and Postal Savings Bank of China Co., Ltd., Yulin Branch (中国邮政储蓄银行股份有限公司玉林市分行) as lender;

xii.    CNY 147,000,000 term loan facility agreement (流动资金借款合同) dated September 19, 2023 entered into between Zhaoqing Biguiyuan Modern Furniture Co., Ltd. (肇庆市现代筑美家居有限公司) as borrower and Guangzhou Bank Co., Ltd., Foshan Jihua

Sub-branch (广州银行股份有限公司佛山季华支行) as lender; and

xiii.  CNY 100,000,000 term loan facility agreement (房地产开发贷款借款合同) dated June 16, 2023 entered into between Zhaoqing Biguiyuan Modern Furniture Co., Ltd. (肇庆市现代筑美家居有限公司) as borrower and Guangzhou Bank Co., Ltd., Foshan Jihua Sub-branch (广州银行股份有限公司佛山季华支行) as lender.

17.    The indebtedness of Country Garden that is included and excluded from the Scheme is summarized in the following table:

| Indebtedness subject to the Scheme | | | |
| --- | --- | --- | --- |
| **Indebtedness** | **Outstanding principal amount as of December 31, 2024 (USD)** | **Capacity of Country Garden** | **Governing law of debt instrument** |
| Existing Syndicated Loans | 3,618,140,128 | Borrower | Hong Kong |
| <u>Total Existing Class 1 Debt Instruments</u> | <u>3,618,140,128</u> | | |
| Existing Convertible Bonds | 884,615,385 | Guarantor | England |
| Existing US Public Notes | 9,375,208,000 | Issuer | New York |
| Existing HK Bilateral Loans | 204,871,795 | Borrower | Hong Kong |
| Existing Loans (Onshore Credit Support) | 575,679,324 | Borrower and Guarantor | Hong Kong and PRC |
| <u>Total Existing Class 2 Debt Instruments</u> | <u>11,040,374,504</u> | | |
| **<u>Total indebtedness subject to the Scheme</u>** | **<u>14,658,514,631</u>** | | |
| Indebtedness not subject to the Scheme | | | |
| **Indebtedness** | **Outstanding principal amount as of December 31, 2024 (USD)** | | |
| Other Offshore Project Financings | 566,803,641 | | |
| Other Onshore Bank Loans and Other Borrowings | 17,478,768,847 | | |
| Onshore Corporate Bonds | 804,842,183 | | |
| Contract Liabilities | 39,165,000,000 | | |
| Trade and Other Payables | 54,841,250,000 | | |
| **<u>Total indebtedness not subject to the Scheme</u>** | **<u>112,856,664,673</u>** | | |

III.    **Circumstances Leading to the Restructuring**

18.    Since mid-2021, a number of high-profile PRC companies in the real estate sector

have experienced difficulties in securing external financing from PRC banks and offshore capital

markets following the COVID-19 pandemic and other macro-economic challenges.  The Country

Garden Group, like many other companies in the PRC real estate sector, has been negatively

affected by this overall downturn in the PRC real estate sector (and the PRC economy as a whole)

in the following respects:

a.    *Difficulty raising onshore and offshore financing*: Since mid-2021, the Country Garden Group has been unable to access typical financing channels, such as bank lending and capital markets for equity and debt-raises.  Reduced bank lending for the real estate sector overall has resulted in reduced access by the Country Garden Group to onshore capital.  The Country Garden Group's other businesses have also been adversely affected due to the overall downturn of the real estate industry.  Furthermore, adverse reaction to these events by offshore capital markets has limited the Country Garden Group's funding sources to address upcoming maturities on its outstanding indebtedness.  The offshore bond market, on which the Country Garden Group heavily relies for refinancing and growth capital, is effectively closed to privately-owned companies in the real estate sector. This difficulty in raising onshore and offshore financing has significantly exacerbated Country Garden's current liquidity pressures.

b.    *Decreased cash flows and liquidity in a deteriorating market*: In light of general tightened government credit policy, multiple high-profile credit events and deteriorating consumer sentiment in the real estate sector, sales for residential property in China have slowed down significantly.  Prices for residential properties have also suffered a substantial reduction and remain depressed in 2025.  This market downturn has adversely impacted the Country Garden Group's ability to generate sufficient cash to service its debts in a timely manner and sustain its operations.

c.    *Continued negative impact of the COVID-19 pandemic*: The PRC economy as a whole continues to remain sluggish post-pandemic, which has continued to affect the business operations of the Country Garden Group in multiple aspects, resulting in, among other things: (a) a slowdown in property sales and a decrease in property sale prices due to poor consumer sentiment as a result of a sustained poor economic outlook; (b) reduced revenues from property management due to continued weakening of consumer demand; and (c) increased difficulty and costs in accessing global capital markets due to overall negative investor sentiment, significant

volatility and liquidity disruptions.  While the PRC central and local governments have taken various measures to boost the economy and stimulate local property markets, which led to some gradual recovery in the sector, the overall outlook in the sector is expected to remain challenging throughout 2025.

19.    The confluence of the above factors has (i) resulted in a significant deterioration of the Country Garden Group's financial position, leading to it incurring losses in the last two financial years – approximately RMB 35.145 billion (or USD 4.89 billion) for the year ended December 31, 2024 and RMB 200.962 billion (or USD 27.97 billion) for the year ended December 31, 2023; and (ii) severely affected the Country Garden Group's ability to sustain its existing capital structure.

### A.    Events Leading Up to the Scheme

20.    In light of the difficulties affecting the overall real estate sector, and to improve the financial position of the Country Garden Group, the Country Garden Group's management took certain actions to shore up capital and mitigate the effects of the overall adverse market conditions. These efforts included implementing cost-control measures and minimizing capital expenditures to preserve liquidity for ongoing development of existing property development projects, implementing measures to accelerate pre-sales and sales of properties under development and completed properties, and speeding up the collection of outstanding sales proceeds.  Additionally, the Country Garden Group is continuing to actively explore potential opportunities for asset disposal to create liquidity.

21.    Despite these efforts however, the overall condition of the real estate sector has reduced both the options and amount of financing available to the Country Garden Group to meet its short-term debt maturities and interest payments (including under the Existing Debt).

B.    **The Restructuring Support Agreement**

22.    As a result of the foregoing, and following a comprehensive consideration of the strategic options available to it, Country Garden believes that formulating a comprehensive restructuring of its offshore indebtedness is the best option for all stakeholders of the Country Garden Group.

23.    Accordingly, Country Garden engaged in extensive negotiations with its major offshore creditors since the first quarter of 2024.  Those negotiations culminated in Country Garden entering into the restructuring support agreement dated April 11, 2025 (the "Restructuring Support Agreement," attached hereto as **Exhibit A-1**) with an ad hoc group of creditors, who are beneficial owners of the Existing US Public Notes (the "Ad Hoc Group").  Appended to the Restructuring Support Agreement is the restructuring term sheet (the "Term Sheet") which sets forth the commercial terms of the restructuring.  Subsequent to the announcement of the Restructuring Support Agreement, Country Garden entered into an amendment to the Restructuring Support Agreement dated on August 18, 2025 to amend the terms of the Restructuring Support Agreement (the "RSA Amendment Agreement") which, *inter alia*, appended a revised Term Sheet.  The RSA Amendment Agreement is attached hereto as **Exhibit A-2**.

24.    Country Garden's efforts have culminated in broad support for the Restructuring Support Agreement and the Scheme.  As of September 12, 2025, the following Scheme Creditors have executed or acceded to the Restructuring Support Agreement (collectively holding approximately 72.63% of the aggregate outstanding principal amount of Existing Debt):

   a.    holders of the Existing Class 1 Debt representing approximately 59.28% of the aggregate outstanding principal amount of the Existing Class 1 Debt; and

      b.    holders of the Existing Class 2 Debt representing approximately 77.00% of the aggregate outstanding principal amount of Existing Class 2 Debt.

## IV.    Overview of the Scheme[4]

### A.    Restructuring Overview

25.    The primary purpose of the Scheme is to enable the implementation of the Restructuring, which is expected to strengthen and "right-size" the Country Garden Group's offshore balance sheet by reducing its offshore debt obligations, providing the Country Garden Group with a longer maturity runway and a stable platform that will also allow it to service its debt obligations, and maximizing value for all stakeholders while ensuring that their rights are adequately protected.

26.    The Scheme contemplates, among other things, the cancellation and discharge of the Existing Debt and the release of all obligors under the Existing Debt ("Existing Debt Obligors") in exchange for Scheme Creditors receiving Scheme Consideration Entitlement, comprising: (i) one or more of the various options set forth below and a contingent value rights instrument (the "Scheme Creditor CVR") and (ii) in respect of the Scheme Creditors holding Existing Class 1 Debt only, certain cash payments and loans described in greater detail below (the "SCA").

27.    In the event that the Scheme fails, Country Garden believes that (i) it will be unable to comply with its obligations under the Existing Debt; (ii) the Country Garden Group will be unable to comply with its other outstanding indebtedness; and (iii) there is a material risk that certain Scheme Creditors, as well as other creditors of the Country Garden Group would pursue enforcement actions against Country Garden and other members of the Country Garden Group. Under those circumstances, Country Garden believes that an insolvent liquidation is the most

---

[4]    Capitalized terms used in this section but not otherwise defined shall have the meanings ascribed to them in the Scheme.

likely alternative, which would be value destructive and result in Scheme Creditors receiving significantly lower returns than are anticipated under the Scheme.[5]

### B.     Description of the Scheme and Issuance of New Instruments

28.     As described in further detail in the Counsel Declaration, a scheme of arrangement under applicable Hong Kong law (which closely follows English law) is a compromise or arrangement entered into between a company and its creditors or between a company and its members.  A scheme of arrangement enables a company to enter into an arrangement in respect of its debts or obligations with its creditors, or one or more classes of its creditors.  Under applicable Hong Kong law, a scheme of arrangement is approved by the requisite majorities of the relevant classes of creditors if at least a majority in number and 75% in value of each such class of creditors present and voting at the scheme meeting vote in favor of such scheme.

29.     The effect of the Scheme will be, subject to the terms of the Scheme, to release the claims of the Scheme Creditors against (i) the Debtor as issuer, borrower or guarantor in respect of its obligations under the Scheme Claims and (ii) the issuers, guarantors and security providers of the Existing Debt in respect of their obligations under the Scheme Claims, except that the obligations of the PRC-incorporated obligors under the Existing Loans (Onshore Credit Support) will not be compromised under the Scheme.

30.     The Scheme provides for certain releases (the "Releases") of claims against Country Garden in respect of the Existing Debt in its capacity as primary obligor, secondary obligor, surety, or otherwise.  All Existing Debt Obligors other than Country Garden will also be

---

[5]     As set forth in greater detail in section 5.73 of the Explanatory Statement, based on Kroll's Restructuring Scenario analysis, Scheme Creditors (Class 1) are expected to recover between 21.1% to 53.9% under the Scheme, but only 9.3% to 11.9% in an insolvent liquidation. Scheme Creditors (Class 2) are expected to recover between 17.7% to 51.0% under the Scheme (excluding recoveries from the Onshore Credit Support which will not be compromised under the Scheme), but only 2.8% to 6.8% in an insolvent liquidation.

released and discharged from their respective obligations (including under any guarantee or security interest) in respect of the Existing Debt, including (i) with respect to the Existing Syndicated Loans, release of claims against the guarantors and arising under security interests over shares of certain of Country Garden's subsidiaries; (ii) with respect to the Existing US Public Notes, the Existing Convertible Bonds, and the Existing HK Bilateral Loans, release of claims against the guarantors and arising under security interests over shares of certain of Country Garden's subsidiaries; and (iii) with respect to the Existing Loans (Onshore Credit Support), release of claims against Country Garden only (collectively, the "Country Garden Group Released Parties").

31.    The Scheme also provides for the release and discharge of the following parties (as defined in the Scheme and, in each case, in its or their stated capacity): (i) the Advisors; (ii) any Director; (iii) the Information Agent; (iv) the Blocked Scheme Creditor Tabulation Agent; (v) the Existing Debt Administrative Parties and their predecessors; (vi) the New Notes Administrative Parties; (vii) the MCB Administrative Parties; (viii) the New Loans Administrative Parties; (ix) the Holding Period Trustee; (x) the Blocked Escrow Agent; and (xi) the AHG, the CoCom and each of their respective Personnel and Affiliates (collectively with the Country Garden Group Released Parties, the "Released Parties"), under or in relation to (a) any step or action, omission or other circumstance occurring on or prior to the Restructuring Effective Date concerning the Existing Debt; and (b) the negotiation, preparation, execution, sanction and/or implementation of the Scheme and/or the Restructuring, including the performance of any step or transaction contemplated by the terms of, without limitation, the Scheme, the Restructuring Steps, the Restructuring Documents, the Restructuring Support Agreement and any other document referred

to in any of the foregoing.  Each Release is qualified and does not, for example, release any claims derived from gross negligence, fraud or willful misconduct.

32.     In return, each Scheme Creditor will be entitled to receive certain consideration in accordance with the terms of the Scheme as described below.

### C.    <u>Scheme Consideration Entitlement</u>

33.     Subject to the satisfaction of the applicable restructuring conditions, the Scheme Creditors will receive a *pro rata* allocation of the below consideration (the "<u>Scheme Consideration Entitlement</u>").  The Scheme Consideration Entitlement provided to a Scheme Creditor will include (a) one or more of the five options summarized below in accordance with each Scheme Creditor's election and/or allocation, subject to the terms of the Scheme, (b) the Scheme Creditor CVR, and (c) in respect of the Scheme Creditors holding Existing Class 1 Debt only, certain cash payments and loans described in greater detail below (the "<u>SCA</u>").

a.  ***Option 1***: participation in a tender offer where Country Garden will be entitled to redeem Existing Debt through a "reverse Dutch auction" by which Country Garden will accept a valid offer submitted by a Scheme Creditor (provided that the offer price is no more than USD 100 for every USD 1,000 of Scheme Consideration Claims) in inverse order of the offer price up to the Option 1 cap of USD 200 million.

b.  ***Option 2***: A series of new zero-coupon mandatory convertible bonds with an aggregate principal amount of up to USD 2.0 billion to be issued by Country Garden with a maturity date of December 31, 2031 following the Reference Date of June 30, 2025, which may be converted into ordinary shares of Country Garden at an initial conversion price of HKD 2.60 per share (the "<u>MCB (A)</u>").

c.  ***Option 3A***: A combination of MCB (A) and a new series of medium-term notes with a 2.5% *per annum* coupon rate, and an amortization repayment schedule starting from 18 months and ending 90 months after the Reference Date of June 30, 2025 (the "<u>MTN</u>"); or ***Option 3B***: a combination of MCB (A) and a new medium-term loan that mirrors the economic terms of the MTN (the "<u>MTL</u>").  The MTN and MTL shall have an aggregate principal amount of up to USD 2,709,300,000, and MCB (A) shall have an aggregate principal amount of up to USD 5,500,700,000.

d.   **Option 4A**: A combination of (i) a series of new zero-coupon mandatory convertible bonds to be issued by Country Garden with a maturity of 114 months following the Reference Date of June 30, 2025, which may be converted into ordinary shares of Country Garden at an initial conversion price of HKD 10 per share (the "MCB (B)") and (ii) a new series of long-term notes with a 2.5% *per annum* coupon rate and an amortization repayment schedule starting from 102 months and ending on 114 months after the Reference Date of June 30, 2025 (the "LTN (A)") or **Option 4B**: a combination of (i) MCB (B) and (ii) a new long-term loan that mirrors the economic terms of the LTN (the "LTL (A)").  The principal amount of the MCB (B), LTN (A), and LTL (A) is not capped.

e.   **Option 5A**: A new series of long-term notes with a 1% *per annum* coupon rate, and an amortization repayment schedule starting from 126 months and ending from 138 months after the Reference Date of June 30, 2025 (the "LTN (B)"); or **Option 5B**: a new long-term loan that mirrors the economic terms of the LTN (B) (the "LTL (B)"). The LTN (B) and LTL (B) shall have an aggregate principal amount of up to USD 1.5 billion.

34.   Additionally, Scheme Creditors holding Existing Class 1 Debt will be provided with the SCA in return for agreeing to participate in the Scheme and to compromise their existing rights under the Existing Class 1 Debt.  The SCA comprises of the following:

a.   **SCA Day 1 Payment**: a *pro rata* cash payment in the aggregate amount of USD 89 million to be paid on or before the Restructuring Effective Date;

b.   **SCA Loan**: a term loan in the principal amount of USD 89 million to be advanced *pro rata* by each of the Scheme Creditors holding Existing Class 1 Debt on or before the Restructuring Effective Date; and

c.   **SCA Warrants**: warrants under which the lender of Existing Class 1 Debt will be entitled to subscribe for ordinary shares of Country Garden at an initial strike price of HKD 0.60 per share in exchange for setting-off a corresponding amount owed to it under the SCA Loan.

## V.   Commencement of the Hong Kong Proceeding

35.   On August 15, 2025, the Debtor filed an originating summons with the Hong Kong Court, a copy of which is attached to the Counsel Declaration as Exhibit A, thereby commencing the Hong Kong Proceeding and seeking, among other things, an order directing the Debtor to

convene a meeting for each class of creditors in respect of the Scheme for the applicable Scheme Creditors in Hong Kong.

36.    The hearing to consider the Debtor's request to convene the Scheme Meetings for the applicable Scheme Creditors (the "Convening Hearing") was held before the Hong Kong Court on September 12, 2025.  The AHG, who represent approximately 29.9% in value of the Existing US Public Notes, instructed legal representatives to attend the Convening Hearing and made submissions in support of the Scheme and to explain the rationale and quantum of the work fees payable to the AHG. Tai Fung Bank Limited, one of the lenders under the Existing Class 2 Debt (representing approximately 0.8% in value of the Existing Debt) also instructed legal representatives to attend the Convening Hearing. Tai Fung Bank Limited did not oppose Country Garden's application to convene the Scheme Metting, but wanted to register its concern that there was a risk that the Scheme would have an unintended impact on certain credit support granted by the PRC-incorporated subsidiaries of Country Garden. Country Garden is presently liaising with Tai Fung Bank Limited to address its concerns. No other Scheme Creditors appeared at the Convening Hearing.

37.    Following the Convening Hearing, the Hong Kong Court granted the order (the "Convening Order") scheduling the Scheme Meetings [6] for the Scheme and scheduling the Sanction Hearing.  The Convening Order is attached to the Counsel Declaration as Exhibit C.

38.    On or around October 13, 2025, no less than 21 days in advance of the Scheme Meetings and in accordance with the Convening Order and section 671 of the Companies

---

[6]    The Convening Order (as defined below) initially set the Scheme Meetings on October 22, 2025.  However, that date is subject to "any adjournment as may be appropriate."  The Debtor is currently negotiating certain final commercial terms with its Scheme Creditors, and accordingly plans to adjourn the Scheme Meetings to on or around November 3, 2025.

Ordinance, applicable notices of the Scheme Meetings (the "Scheme Meeting Notices") will be provided:

    a.    by publication on the transaction website https://projects.sodali.com/countrygarden (the "Transaction Website") and through a public announcement published on the HKEX website;

    b.    by Sodali & Co (the "Information Agent") through the Clearing Systems and via email to each person whom the Debtor believes is or may be a Scheme Creditor, and for whom the Information Agent has a valid email address; and

    c.    in respect of the Scheme Creditors that are lenders under certain of the loans of the Debtor or holders of certain notes guaranteed by the Debtor that are not subject to the Clearing Systems, via email to the email address for such Scheme Creditors in accordance with the notice provisions of the underlying finance documents.

39. In addition, under the Convening Order, the Hong Kong Court authorized and appointed Mat Ng or, if he is unable to act in that capacity, Nigel Trayers to act as the Chairperson for the Scheme Meetings (the "Scheme Chairperson").

40. As required by the terms of the Convening Order, electronic copies or a link to the Transaction Website (or both) will be provided to Scheme Creditors so that they can view and download the Scheme, the explanatory statement (the "Explanatory Statement") and the applicable solicitation materials, as well as the other documents referred to in the Explanatory Statement. A copy of the Explanatory Statement is attached to the Counsel Declaration as Exhibit C.[7]

41. The Scheme Meetings will be held on or around November 3, 2025. At the Scheme Meetings, a vote will be held to determine whether each class of Scheme Creditors that is present

---

[7] The copy of the Explanatory Statement attached to the Counsel Declaration as Exhibit C thereto was the version that was filed with the Hong Kong Court prior to the Convening Hearing on September 12, 2025. The Debtor is continuing to negotiate with its Scheme Creditors to finalize certain commercial terms of the Restructuring, which will result in further changes to the Explanatory Statement. It is anticipated that the Explanatory Statement will be finalized and sent out to the Scheme Creditors on or around October 13, 2025. The Debtor will file the final version of the Explanatory Statement on the docket with this Court along with a redline to the version attached to the Counsel Declaration as Exhibit D thereof as soon as it is available.

and voting in person or by proxy approves the Scheme by a majority in number representing at least 75% in value. All applicable Scheme Creditors will have the opportunity to attend, be heard, and vote at the Scheme Meetings, in person, by authorized representative (if a corporate entity), or by proxy and to ask questions regarding the respective Hong Kong Scheme.

42.    If the Scheme is approved by the Scheme Creditors, the Debtor will provide notice to the Scheme Creditors informing them that the Scheme has been approved and that the Sanction Hearing has been scheduled. Scheme Creditors will also be informed that they can attend and raise any issues or objections at the Sanction Hearing. In anticipation of the Sanction Hearing, the Scheme Chairperson will file a report on the Scheme Meetings. The Hong Kong Court will then decide whether to sanction the Scheme.

43.    If the Hong Kong Court deems it appropriate to enter an order sanctioning the Scheme following the Sanction Hearing (the "Sanction Order"), the Sanction Order is expected, among other things, to (i) sanction and approve consummation of the Scheme and (ii) authorize the Restructuring as set forth in the Scheme. Upon delivery of the Sanction Order to the Hong Kong Registrar, and subject to certain additional conditions as set forth in the Explanatory Statement, the Scheme will become effective and thereby binding on all Scheme Creditors.

44.    The timeline for the Hong Kong Proceeding and this Chapter 15 Case is summarized below:

| Key Events | Date |
|---|---|
| Convening Hearing | Friday, September 12, 2025 |
| Convening Order | Tuesday, September 16, 2025 |
| Chapter 15 Petition Date | Wednesday, October 1, 2025 |
| Scheme Meetings | On or around Monday, November 3, 2025 |
| Proposed Chapter 15 Recognition Hearing | [Tuesday, November 4, 2025] |
| Sanction Hearing | Thursday, December 4, 2025 |

| Anticipated Restructuring Effective Date | By Wednesday, December 31, 2025 |

## VI.    Status as Foreign Representative and of the Hong Kong Proceeding Satisfies the Provisions of the Bankruptcy Code

### A.    Appointment as Foreign Representative and Filing of the Chapter 15 Petition

45.    I have been informed by the Country Garden Group's legal advisors that a chapter 15 proceeding is commenced by the filing of a petition for recognition (and related documents) by the "foreign representative." I was further informed that under section 1516(a) of the Bankruptcy Code, a bankruptcy court may presume that the person petitioning for chapter 15 recognition is a foreign representative if the decision or certificate from the foreign court so indicates. I understand that "foreign representative" is defined in section 101(24) of the Bankruptcy Code to mean:

> . . . a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

> 11 U.S.C. § 101(24).

46.    I have been authorized by the Board Resolution to act as the Debtor's agent in seeking any relief available to a "foreign representative" under Chapter 15 of the Bankruptcy Code, including, among other things, to seek recognition of the Scheme.

47.    In light of the statutory presumption embodied in section 1516(a) of the Bankruptcy Code noted above, the Bankruptcy Code's definition of "foreign representative," and the Board Resolution, I believe that I satisfy the requirements to serve as the Foreign Representative of the Debtor.

48.    Country Garden has property in the United States in the form of a retainer with the Country Garden Group's U.S. counsel, Linklaters LLP, which funds are held in a client trust account in New York, New York. Moreover, Country Garden has submitted to New York

jurisdiction under the Existing US Public Notes.  Therefore, on the date hereof, in my capacity as the Foreign Representative, I caused to be filed the Chapter 15 Petition pursuant to sections 1504 and 1515 of the Bankruptcy Code commencing this Chapter 15 Case in the United States Bankruptcy Court for the Southern District of New York, seeking recognition of the Hong Kong Proceeding as a "foreign main proceeding," as such term is defined in section 1502(4) of the Bankruptcy Code, or in the alternative as a "foreign nonmain proceeding," as such term is defined in section 1502(5) of the Bankruptcy Code, and seeking related relief.

49.    I believe that recognizing me as a "foreign representative" as defined in section 101(24) of the Bankruptcy Code and recognition of the Hong Kong Proceeding as a "foreign main proceeding" or in the alternative as a foreign non-main proceeding is consistent with the purpose of Chapter 15 and will allow Country Garden to restructure in the most efficient manner without jeopardizing the creditors' rights.

50.    I believe that this Chapter 15 Case will enable Country Garden to achieve the objectives of the Scheme by: (i) ensuring that the parties in interest to the Restructuring, including Country Garden and the Scheme Creditors, are treated in the United States consistent with the intentions of the Scheme; (ii) ensuring that the Restructuring is binding, valid, and enforceable in the United States; and (iii) minimizing the risk of litigation over any potential residual claims that might exist under the Existing Debt.

**B.    The Hong Kong Proceeding is a "Foreign Main Proceeding"**

51.    For the reasons set forth below, I believe that the Hong Kong Proceeding is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code.

52.    I am informed that "foreign proceeding" is defined in section 101(23) of the Bankruptcy Code to mean:

"[C]ollective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the Debtors are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation . . ."

11 U.S.C. § 101(23).

53.    I believe that the Hong Kong Proceeding is a "foreign proceeding" falling within the foregoing definition.  As more fully explained in the Counsel Declaration, the Hong Kong Proceeding is (i) a collective judicial proceeding, (ii) in Hong Kong, and (iii) governed by the Hong Kong statute applicable to schemes of arrangement, the Companies Ordinance.  In the Hong Kong Proceeding, Country Garden's assets and affairs are subject to the control or supervision of the Hong Kong Court.  The purpose of the Hong Kong Proceeding and the Scheme is to effectuate a restructuring of Country Garden.  Specifically, the Scheme Creditors will release Country Garden, among others, from their respective obligations and liabilities and will receive their applicable share of the Scheme Consideration Entitlement.

54.    I am also informed that section 1517(b)(1) of the Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign main proceeding" if the foreign proceeding is pending in the country where the debtor has "the center of its main interests" ("COMI").  I am informed that COMI is not defined in Chapter 15, but section 1516(c) of the Bankruptcy Code provides that "[i]n the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests."

55.    I believe that, while Country Garden's place of incorporation and location of its registered office is the Cayman Islands, Country Garden's COMI is Hong Kong for the reasons set forth below.

1.     **Location of Country Garden's Headquarters**

56.     Although Country Garden is incorporated under the laws of the Cayman Islands, Country Garden does not conduct business in the Cayman Islands.  Country Garden's shares are publicly listed on the HKEX, and it is registered as a non-Hong Kong company in Hong Kong under Part XI of the Companies Ordinance.  Country Garden's physical headquarters and principal place of business are located at Suite 1702, Dina House, Ruttonjee Centre, 11 Duddell Street, Central, Hong Kong.  Accordingly, Country Garden's headquarters are located in Hong Kong which supports the conclusion that Country Garden's COMI is in Hong Kong.

2.     **Location of Those Who Actually Manage Country Garden**

57.     Country Garden is the ultimate parent of the Country Garden Group and its principal business activities have been limited to (i) holding equity in the intermediate parent of the Country Garden Group, Smart World Development Holdings (the "Intermediate Parent"), which holds the equity of Country Garden Group's onshore and offshore subsidiaries, (ii) raising debt capital, and (iii) more recently, restructuring its Existing Debt.  Additionally, Country Garden's restructuring activities, which have constituted Country Garden's principal business activities since October 2023, have been conducted primarily in Hong Kong.  Country Garden's restructuring efforts have been conducted by a management team of individuals, some of whom live and work in Hong Kong.

58.     Country Garden's professional advisors advising on the restructuring are and have been based primarily in Hong Kong.  Most of the in-person meetings to negotiate commercial terms of the restructuring between Country Garden and its creditor groups have taken place in Hong Kong. The principal representatives of the creditors participating in the restructuring are also

predominantly located in Hong Kong.  Accordingly, in my view, those who actually manage Country Garden are located in Hong Kong.

### 3.      Location of Country Garden's Primary Assets

59.      Country Garden's primary assets are its equity investments in the Intermediate Parent and Cayman-incorporated Country Garden Finance Holdings Company Limited.  Country Garden's holdings in the Intermediate Parent and Country Garden Finance Holdings Company Limited, as well as all of the Intermediate Parent's and Country Garden Finance Holdings Company Limited's holdings in its subsidiaries, as applicable, are in the form of certificated securities which are physically held in Hong Kong at its address in Hong Kong.  Country Garden's other main assets comprise receivables representing intercompany debts owed by other entities in the Country Garden Group.  As a matter of Hong Kong law, these receivables would be deemed to be located in Hong Kong.  Country Garden also owns certain bank accounts that are situated in Hong Kong.  Country Garden does not have assets in the Cayman Islands.  Accordingly, Country Garden's primary assets are located in Hong Kong.

### 4.      Location of a Majority of Country Garden's Creditors

60.      A significant number of Country Garden's key creditors affected by the Restructuring (comprising members of the Ad Hoc Group and the coordinating committee of banks under the Existing Syndicated Loans) are located in, or have connections to, Hong Kong.  The financial and legal advisors engaged by those creditors in connection with the Restructuring are also primarily located in Hong Kong.  At least 37.1% (by value) of Scheme Creditors are either located in Hong Kong or managed from Hong Kong,[8] with no other location having a higher

---

[8]      Based on information available to Country Garden from accessions to the Restructuring Support Agreement or Scheme Creditors otherwise identifying themselves to Country Garden.

percentage (by value) of participating Scheme Creditors.  Accordingly, a significant proportion of affected creditors and their advisors are located in Hong Kong.

### 5.     Jurisdiction Whose Law Would Apply to Most Disputes

61.     The laws governing the debt being restructured as part of the Scheme are New York law, English law, PRC law, and Hong Kong law.  None of the debt being comprised as part of the Scheme is governed by Cayman Islands law.  As noted above, Country Garden maintains a principal place of business in Hong Kong, and therefore must submit to Hong Kong law.  Furthermore, because Country Garden's shares are listed on HKEX, Country Garden must submit to the jurisdiction of the Hong Kong Securities and Futures Commission.   Further, the Restructuring Support Agreement are governed by Hong Kong law.  Finally, the Scheme Meetings will occur in Hong Kong, and the Hong Kong Court is overseeing the Scheme by conducting the Convening Hearing and the Sanction Hearing in Hong Kong. Therefore, many, if not most, disputes with Country Garden would have a nexus to Hong Kong and will therefore be subject to Hong Kong law.

### 6.     The Ascertainability of Country Garden's COMI in Hong Kong

62.     The Restructuring Support Agreement specifically contemplated the commencement of the Scheme.  Moreover, holders of approximately 72.63% of the aggregate outstanding principal amount of the Existing Debt have executed the Restructuring Support Agreement and support the Scheme.  No Scheme Creditor has raised issues about the propriety of Hong Kong as the COMI of Country Garden or about any actions of management in proffering a Hong Kong COMI and establishment in Hong Kong.  The recent restructuring activities of Country Garden in Hong Kong with its creditors located in Hong Kong and elsewhere and the fact that most of those creditors consent to the Restructuring further supports a finding that Country

Garden's COMI is located in Hong Kong.  Consequently, the presumption that Country Garden's COMI is the location of its registered office in the Cayman Islands is rebutted by contrary evidence, and therefore Country Garden's COMI is located in Hong Kong.

**C.**   **In the Alternative, the Hong Kong Proceeding is a "Foreign Nonmain Proceeding"**

63.     In the event that this Court concludes that Country Garden's COMI is not located in Hong Kong, I believe that this Court should recognize the Hong Kong Proceeding as a "foreign nonmain proceeding."  I am informed that a foreign nonmain proceeding takes place in a jurisdiction that is not the entity's center of main interests, but where it has an "establishment," as defined as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. §§ 1502(2), (5).

64.     Country Garden conducts pertinent economic activity locally (in Hong Kong) as the ultimate holding company of the Country Garden Group and is registered to do business in Hong Kong.  Country Garden has its shares listed publicly on the HKEX, and continues to conduct substantial restructuring activities in Hong Kong that affect creditors located in, or that have connections to, Hong Kong.

65.     As such, to the extent that this Court finds that the Hong Kong Proceeding is not a "foreign main proceeding," I believe this Court should find that the Debtor has an "establishment" in Hong Kong under section 1502(2) of the Bankruptcy Code and recognize the Hong Kong Proceeding as a "foreign nonmain proceeding" as defined in section 1502(5) of the Bankruptcy Code.

**D.**   **Statement Pursuant to Section 1515 of the Bankruptcy Code**

66.     I am informed that section 1515 of the Bankruptcy Code provides, in pertinent part, as follows:

i.   A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

ii.   A petition for recognition shall be accompanied by—

a.   a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

b.   a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

c.   in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

iii.   A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

11 U.S.C. § 1515.

67.    As noted above, the Board Resolution appointing me as the Foreign Representative and authorizing me to commence this Chapter 15 Case is attached hereto as **Exhibit B**.

68.    The Hong Kong Proceeding, along with the Scheme, comports with U.S. law and, I am advised by U.S. counsel, satisfies the requirements for recognition under chapter 15 of the Bankruptcy Code.  Recognition of the Hong Kong Proceeding is a critical component to the implementation of the Scheme without disruption or the threat of adverse actions by dissenting creditors against Country Garden.  Without chapter 15 recognition, the Restructuring could be fundamentally undermined to the detriment of all parties in interest.  I believe that the interests of all Scheme Creditors are aligned with Country Garden obtaining chapter 15 recognition of the Hong Kong Proceeding.

## **CONCLUSION**

69.     For the reasons stated herein and in the Verified Petition, I respectfully request that the Petitions for recognition of the Hong Kong Proceeding as a foreign main proceeding, or, in the alternative, as a foreign nonmain proceeding and for related relief be granted in their entirety, together with such other and further relief as this Court deems just and proper.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: October 1, 2025

_/s/ Fong Ching Lam_____
Fong Ching Lam
Deputy General Manager of
Country Garden Holdings Company Limited